

Robert W. Sadowski
SADOWSKI FISCHER PLLC
39 Broadway, Suite 1540
New York, New York 10006
Tel. No.: (212) 913-9678

Attorneys for Relator John Doe

13 CV 4580

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/3/15

UNITED STATES OF AMERICA;
STATE OF CALIFORNIA;
STATE OF COLORADO;
STATE OF CONNECTICUT;
STATE OF DELAWARE;
STATE OF FLORIDA;
STATE OF GEORGIA;
STATE OF ILLINOIS;
STATE OF INDIANA;
STATE OF LOUISIANA;
STATE OF MARYLAND;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN;
STATE OF MONTANA;
STATE OF NEVADA;
STATE OF NEW JERSEY;
STATE OF NEW YORK;
STATE OF NORTH CAROLINA;
STATE OF OKLAHOMA;
STATE OF RHODE ISLAND;
STATE OF TENNESSEE;
STATE OF TEXAS;
COMMONWEALTH OF VIRGINIA;
STATE OF WISCONSIN;
DISTRICT OF COLUMBIA;
NEW YORK, NEW YORK;
CHICAGO, ILLINOIS,
*ex rel.* JANE DOE,

        Plaintiffs/Relator

        - against -

CVS CAREMARK,

        Defendant.



**COMPLAINT**

**FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

On behalf of the United States of America, and on behalf of the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, the Commonwealth of Massachusetts, Michigan, Montana, Nevada, New Jersey, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, the Commonwealth of Virginia, Wisconsin, the District of Columbia and Chicago, Illinois and New York, New York (collectively "the States"), and Relator John Doe ("Relator"), by and through Relator's attorneys Sadowski Fischer PLLC, file this *qui tam* action against CVS Caremark ("Defendant"), and allege as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.      This action seeks to recover treble damages and civil penalties on behalf of the United States of America and the above-captioned States and Cities arising from the conduct of Defendant who: made, used, or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the United States of America; all in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") and the applicable State False Claims Acts.

2.      These claims are based on Defendant's submissions of false and fraudulent claims to the federal Medicare Program and the States' Medicaid Programs and other federal and state funded programs for payment of funds for the reimbursement of claims for infusion pharmaceuticals and related services.

3.      Defendant engaged in a scheme whereby it entered into unlawful financial relationships with doctors providing them with kickbacks in order to incentivize them to prescribe Defendant's pharmaceuticals, violating the Anti-Kickback Statute and the Stark Act. More specifically, Defendant provided free nursing services to patients who receive high-cost

2

pharmaceuticals through infusion, thereby providing an unlawful kickback to both the patients

and to the physicians who prescribe Defendant's high-cost pharmaceuticals through infusion and

injection.

4.      Defendant's false claims and fraudulent actions caused the Federal Government

and the States to be damaged by hundreds of millions of dollars.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims brought under the False Claims Act

pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §§ 1331 (Federal question), and

1345 (United States as plaintiff).

6.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28

U.S.C. §§ 1391(b) (1) and (2), because Defendant resides or transact business in the Southern

District of New York, and because a substantial part of the events or omissions giving rise to the

claims occurred in this District.

7.      This action is not jurisdictionally precluded by the public disclosure bar of the

False Claims Act, 31 U.S.C. § 3730(e) (4).  Upon information and belief, there has been no

"public disclosure" of the matters alleged herein and this action is not "based upon" any such

disclosure.  Through interactions with various employees of the Defendant and other persons,

Relator has "direct and independent knowledge" of the instant allegations.  In addition, Relator

has "voluntarily provided," and offered to provide, this information to the Government before

the filing of this complaint.  Therefore, to the extent any of these allegations are deemed to have

been based upon a public disclosure, Relator is an "original source" of this information within

the meaning of the False Claims Act, and is expressly excepted from the public disclosure bar.

## THE PARTIES

8.       Plaintiff is the United States of America on behalf of its agency the United States Department of Health and Human Services ("HHS") and the Center for Medicaid and Medicare Services ("CMS").  The United States is a real party in interest in this action because the United States provides at least 50% of the funding for the Medicaid Program.  Typically, the states provide 50% of the funding for the Medicaid Program in each state.

9.       Relator Doe is an individual residing in Illinois.  Relator is a registered nurse in Illinois.  Prior to joining CVS in May of 2011 as Director of Nursing and Home Care for the Specialty Pharmacy, Relator managed home care and hospice agencies.  Relator is familiar with the Stark laws and Anti-Kickback statutes.  One of her primary duties and responsibilities in her management positions was to ensure agencies did not provide any services that could be seen as inducements to physicians, referral sources, or patients.

10.      Defendant CVS Caremark ("CVS") is based in Illinois and is one of the largest U.S. drugstore chain and specialty pharmacy.  CVS provides specialty pharmacy services and infusion pharmacy services to patients with acute or chronic conditions who can be treated at home.  Its services included the distribution and administration of infusible and injectable medications, patient care coordination, clinical and compliance management, and reimbursement support.  CVS provided its services through a network of pharmacies across the country.

11.      CVS has pharmacies across the country that dispense drugs to patients who require nursing services to assist to infuse or injection medications, *i.e.,* intravenous administration, and to teach patients to self-administer infusion or inject medications.  CVS also sends nurses to physician offices to provide infusion/injection training to patients.  Relator's staff is also responsible for arranging home care or office visits of patients.

4

12.     CVS also owns Choice Source Therapeutics, a home care agency in Texas and Alabama, which do not have Medicare home care provider numbers.  Relator is responsible for that agency which mainly provides hemophilia medications and nursing services.

13.     CVS Caremark provides free nursing services for hemophilia clients and other infused or injected patients, in order to induce physician referrals and because patients have come to expect free services and would change providers if not given free nursing services.

## THE LAW

### The Medicare Program

14.     Medicare is a Federal Government-funded medical assistance program, primarily benefiting elderly individuals, 42 U.S.C. §§ 1395, *et seq.*  Medicare is administered by the Federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").

15.     Prior to January 1, 2006, Medicare did not pay for over-the-counter drugs or most self-administered prescription drugs.  However, Medicare did pay for certain categories of drugs used by Medicare beneficiaries, including certain hospital-administered or physician-administered drugs.

16.     Medicare typically covers the costs of drugs administered by infusion.

17.     Compliance with the Anti-Kickback Statute and the Stark Act are conditions of payment for reimbursement under the Medicare Program.

### The Medicaid Program

18.     The Medicaid program provides medical coverage to the needy, the medically needy aged, the blind, the disabled, and needy families with dependent children.  42 U.S.C. §§ 1396-1396v.  The Medicaid program is funded by both Federal and State funds, (collectively

referred to as "Medicaid Funds"), with the Federal contribution computed separately for each State. 42 U.S.C. §§ 1396b; 1396d(b). At the Federal level, Medicaid is administered by CMS. Medicaid is used by 49 states, each of which has a State Medicaid agency to administer the program.

19.     The states are permitted to expend Medicaid Funds to provide medical assistance for eligible persons for inpatient and outpatient prescription drugs. 42 U.S.C. § 1396a(10)(A); 1396d(a)(12).

20.     Compliance with the Anti-Kickback Statute and the Stark Act are conditions of payment for reimbursement under the Medicaid Program.

**The Federal False Claims Act**

21.     The FCA, specifically 31 U.S.C. § 3729(a)(1) and (2), imposes liability upon any person who: "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement to get false or fraudulent claims paid or approved." Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

22.     The FCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(B). The FCA also broadly defines a "claim" as including "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

6

23.     Under the FCA, kickbacks and unlawful financial relationships are a violation of law, rendering the payor and recipient of kickbacks liable for damages and penalties, as are violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) and the Stark Act, 42 C.F.R. § 411.353.

**The State and City False Claims Acts**

24.     Each of the captioned State and City plaintiffs has their own False Claims Act or similar statute. The false or fraudulent claims and statements at issue involve payments made by State-funded health assistance and insurance programs, including Medicaid, and payments made by other State-funded agencies or entities.

25.     The statutes of the States under which Relator brings these actions are the:

a.  California False Claims Act, Cal. Govt. Code §§ 12650, *et seq.*;

b.  Colorado Medicaid False Claim Act, C.R.S. §§ 25.5-4-304, *et seq.;*

c.  Connecticut False Claims Act, Gen. Stat. of Ct., Chap. 319v, §§17b-301a, *et seq.;*

d.  Delaware False Claims and Reporting Act, 6 Del C. §§ 1201, *et seq.*;

e.  Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*;

f.  Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.*;

g.  Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1, *et seq.*;

h.  Indiana False Claims and Whistleblower Protection Act, In. Code §§ 5-11-5.5 *et seq.*;

i.  Louisiana False Claims Act/Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. Ch. 3 §§ 437.1, *et seq.*;

j.  Maryland False Health Claims Act, §§ 2-601 *et seq.;*

k.  Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §§ 5A, *et seq.*;

l.  Michigan Medicaid False Claims Act, MCLS §§ 400.601 *et seq.*;

m.  Montana False Claims Act, Mont. Code §§ 17-8-401 *et seq.*;

n.  Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010, *et seq.*;

o.  New Jersey False Claims Act, N. J. Stat. Ann. §§ 2A:32C-1 *et seq.*;

p.  New York False Claims Act, N.Y. Fin. Law §§ 187 *et seq.*;

q.  North Carolina False Claims Act, N. C. Gen. Stat. Ann. §§ 1-605 *et seq.*;

r.  Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. §§ 5053 *et seq.*;

s.  Rhode Island False Claims Act, R. I. St. §§ 9-1.1-1 *et seq.*;

t.  Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181, *et seq.*;

u.  Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§ 36.001 *et seq.;*

v.  Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1, *et seq.*;

w.  Wisconsin False Claims Act, Wis. Stat. Ann. §§ 20.931 (1) *et seq.*; and

x.  District of Columbia False Claims Act, D.C. Code §§ 2-308.03, *et seq.*

y.  Chicago False Claims Act, Municipal Code ch.1, §§ 22-010 *et seq.*

z.  New York City False Claims Act, N.Y.C. Admin. Code, §§ 7-801 *et seq.*

**The Anti-Kickback Statute**

26.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), reflects Congress'

concern that payments to those who can influence healthcare decisions will result in goods and

services being provided that are medically unnecessary, of poor quality, or even harmful to a

vulnerable patient population.  To protect the integrity of the program from these difficult to

detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any

form, regardless of whether the particular kickback gave rise to overutilization or poor quality of

care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that

kickbacks masquerading as legitimate transactions do not evade its reach.  *See* Social Security

Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b. Medicare-

Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

27.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs.  42 U.S.C. § 1320a-7b(b).

28.     The Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person—

> (1)     to refer an individual to a person for the furnishing of any item or service covered under a federal healthcare program; or
>
> (2)      to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

29.      The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).

30.     Parties who contract or subcontract with the Federal Government are subject to the provisions of the Anti-Kickback Statute.  That law renders it impermissible for any person "to provide, attempt to provide, or offer to provide any kickback," and defines 'kickback' to mean "any money, fee, commission, credit, gift, gratuity, *thing of value*, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee *for the purpose of improperly obtaining or rewarding favorable treatment* in connection with a prime contractor in connection with a subcontract relating to a prime contract."  41 U.S.C. §§ 52 -53 (emphasis added).

31.     The federal Anti-Kickback Statute makes it illegal to offer, pay, solicit, or receive anything of value as an inducement to generate business payable by federal health care programs.  In addition, federal law forbids offering or giving something of value to a federal health care program beneficiary if it likely will influence the beneficiary's choice of provider. Therefore, a pharmacy cannot reduce customer copayment obligations or payment responsibilities absent an individualized, good faith determination of financial need or legal requirement.

32.     Examples of arrangements that may run afoul of the Anti-Kickback Statute include practices in which a home health agency provides items or services for free or below fair market value to beneficiaries of Federal health care programs, provides nursing or administrative services for free or below fair market value to physicians, hospitals or other potential referral sources.  See 42 U.S.C. § 1320a-7b; 60 Fed. Reg. 40,847 (1995); 63 Fed. Reg. 42,414, 42,418 (Aug. 7, 1998).

33.     Defendant impliedly and/or expressly certified compliance with the Anti-Kickback Statute.

**The Stark Laws**

34.     Enacted as amendments to the Social Security Act, 42 U.S.C.§ 1395nn (commonly known as the "Stark Statute"), the Stark Statute prohibits a health care provider, such as a nursing service or pharmacy, from submitting Medicare and Medicaid claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the health care provider.  The regulations implementing 42 U.S.C. § 1395nn expressly require that any provider collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

35.     The Stark Laws establish the clear rule that the government will not pay for items or services prescribed by physicians who have improper financial relationships with other providers.  In enacting the statute, Congress found that financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied upon various academic studies consistently showing that physicians who had financial relationships with health care providers ordered more of those providers' services than physicians without those financial relationships.  The Stark Laws were designed specifically to reduce the loss suffered by the Medicare and Medicaid programs due to such questionable overutilization of services.

36.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  From its inception the Stark Statute was targeted at clinical laboratory services. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.  In 1993, Congress extended the Stark Statute ("Stark II") to referrals for ten additional designated health services ("DHS").  Stark II also extended aspects of the Medicare prohibition on physician referrals to Medicaid.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, §§ 13562, 13624. Social Security Act Amendments of 1994, P.L. 103-432, § 152.

37.     In pertinent part, the Stark Statute provides:

a.   Prohibition of certain referrals

(1) In general

11

Except as provided in subsection (b) of this section, if a physician (or immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2) then—

> (A) <u>the physician may not make a referral to the entity</u> for the furnishing of designated health services for which payment otherwise may be made under this subchapter,
>
> (B) <u>the entity may not present or cause to be presented a claim under this subchapter or bill</u> to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
>
> 42 U.S.C. § 1395nn (emphasis added).

38.     The Stark Laws broadly define prohibited financial relationships to include any compensation paid directly or indirectly to a referring physician, subject to certain exceptions not applicable in this case.  The financial relationships that trigger the prohibition on referrals include any ownership or investment interest in the entity as well as any compensation arrangement with the entity, unless an exception applies.  42 C.F.R. § 411.354.  Indirect financial arrangements in which the relationship is formed through an intervening third party are also included.  *Id.*

39.     A *direct* financial relationship exists if remuneration passes between the referring physician and the entity furnishing DHS.  42 C.F.R. § 411.354(a)(2).  Remuneration means any payment or other benefits made directly or indirectly, overtly or covertly, in cash or in kind.  42 C.F.R. § 351.   Remuneration includes the provision of services and benefits.

40.     A "referral" means a request by a physician for an item or service for which a payment may be made under Medicare, including a request for a consultation (including any tests or procedures ordered or performed by the consulting physician or under the supervision of

the consulting physician), and the request or establishment of a plan of care by a physician that includes the furnishing of DHS (with certain exceptions for consultations by pathologists, diagnostic radiologists, and radiation oncologists).  42 U.S.C. § 1395nn(h)(5).

41.     The Stark Laws prohibit the billing of DHS that were provided as a result of a prohibited referral.  42 C.F.R. § 411.353(b).  An entity that receives a prohibited referral may not present a claim, or cause the presentation of such claim to Medicare or Medicaid or other third-party payer for reimbursement of the services.  *Id.*

42.     An entity that collects payment for DHS that were performed under a prohibited referral must refund all collected amounts on a timely basis.  42 C.F.R. § 411.353(d).

43.     In sum, the Stark Laws prohibit health care providers from billing Medicare for certain designated services referred by a physician with whom the provider has a financial relationship of any type not falling within specific statutory exceptions.  42 U.S.C.§ 1395nn

44.     Defendant impliedly and/or expressly certified compliance with the Stark Laws.

## THE FACTS

**CVS Caremark Free Nursing Kickback Scheme and Unlawful Financial Arrangement**

45.     Defendant provides its clients with intravenous and injectable medications at home.  Defendant provides expensive therapies called Specialty Medications.

46.     Specialty Medications are used in the treatment of chronic conditions and complex therapies such as rheumatoid arthritis, multiple sclerosis, and cancer.  In addition, CVS is one of the nation's leading providers of home infusion therapy with intravenous immunoglobulin for bleeding and medications for disorders such as hemophilia and von Willebrand disease.

47.     Specialty medications, such as those used to treat hemophilia, are very expensive and can cost over $150,000 per year per patient.  Hemophilia medications are "high-value medications."  Upon assuming her job at CVS, CVS management informed her that CVS provides free nursing services for hemophilia clients, in order to capture the referral from the physician and also because the patients expect this non-billed service or they would change pharmacy providers to another pharmacy who would provide free nursing services.

48.     CVS does not bill for many nursing services if the beneficiary does not qualify for a reimbursement source.  CVS management views this practice as an inducement, but continues to provide free nursing for fear of losing clients to its competition, who also provide the same type of arrangements to patients and physicians.

49.     Medicare and Medicaid beneficiaries do not normally qualify for home nursing services because they do not meet the reimbursement criteria such as homebound status.

50.     CVS management has directed Relator to approve the unbilled nursing services because CVS has been able to bill for the drugs and thereby can absorb the cost of providing free nursing services.

51.     Sales representatives regularly request that free nurses go to physician's offices to train patients on self-injections, such as hepatitis C drugs.  This is an inducement because physicians who receive the free nursing services will provide drug referrals to CVS.

52.     In January 2012, CVS started performing under a new contract to manage the infusions for a federal employee plan ("FEP").  When FEP patients came on service with CVS, CVS first informed them that CVS would bill their local Blue Cross Blue Shield plan for nursing.  Upon hearing this, many refused CVS services, stating that their previous provider Accredo did not bill them for nursing services.  After bringing this to the attention of

management, Relator was directed to absorb the nursing costs whenever anyone argued over being billed.

53.     In 2012, CVS provided over five million dollars in nursing to Specialty Pharmacy patients, but only billed for approximately $800,000 to those patients who had insurance that covered the nursing services.

54.     When Relator first began to track and approve free nursing visits for all non-hemophilia patients, CVS employed a formula to calculate the cost of nursing against the drug margin and only absorbed the cost if there was still profit.  Relator prepared for CVS various formulas to determine the cost to CVS of absorbing the free nursing services for each injectable drug, for example Gammagard, which cost $137.92 per unit and 23 units are often in one dosage. If there was no profit to CVS in providing the free nursing service, based on the margin on profit on the drug, CVS refused nursing service to the patient.

55.     Relator provided monthly summaries of the number of new unbilled patients and costs to provide nursing services to her Vice President Joan O'Rourke.

56.     On January 11, 2012, CVS initiated a project call Specialty Services Initiative ("SSI") and one of the sub-committees was headed by Relator, to evaluate nursing and drug co-pay practices to determine if CVS would continue to provide free services.  Relator provided management with data to show the costs of and situations of what was being provided for free. After multiple meetings, CVS determined it should be changing its practice to bill for nursing services because of the Anti-Kickback statute, which management was well aware they were violating.

57.     The federal employee contract CVS had signed clearly told patients not to accept any free service or waiver of a co-pay.

58.     After several months, while senior CVS management determined how to proceed with the issue of providing free nursing and waiving co-pays, a nursing summit with all senior vice presidents was scheduled for March 2012.  At that point and going forward, Relator was excluded from meetings held to discuss this issue.  Relator later received the meeting minutes from the March 2012 meeting and found that the issue of free nursing services and waiver of co-pays was excluded from SSI discussions.

59.     It was widely known and discussed at many levels within CVS that if CVS began to bill patients who had not previously been billed for nursing services, those patients would exit CVS and purchase their drugs from CVS's competition and CVS could not afford to risk losing those highly reimbursed infusion drug patients.

60.     Throughout 2012, CVS continued the same practice of billing some patients for nursing services, *i.e.*, those who had insurance to cover the reimbursement of nursing services, but not others, who had no such coverage.  Joan O'Rourke continuously directed Relator to control the nursing costs, however, CVS had expanded their Medicare D and Medicaid contracts so CVS continued to experience an increase in unreimbursed costs to provide free nursing services to those patients.

61.     Sales representatives and program managers repeatedly told Relator that if she changed the practice and began to bill patients, CVS would lose many patients and "Relator" would cause tremendous losses to CVS.  In response, Relator told sales representatives and program managers that this required change and was "not my idea", but the law, and that Relator was waiting for management direction on how to proceed.

62.     On November 20, 2012, Relator met with CVS contracting officials and others, because of concerns raised by Relator about other nursing services.  This communication was

escalated to upper management that CVS was still providing free nursing services and had not changed that practice.  Approximately one week later, O'Rourke called Relator and asked her to quickly put together a document for top management, explaining that O'Rourke's staff had tried to solve the issue by hiring a company called Bioscrip to provide nursing to CVS patients. Relator was to explain in that document that hiring Bioscrip had not solved the issue because Bioscrip did not have sufficient nursing contracts and too few ambulatory infusion centers to send patients to.  As a consequence, CVS continued to provide free nursing services to hemophilia patients and Bioscrip was directed not to bill hemophilia patients for nursing services.

63.     O'Rourke repeatedly told Relator to physically deliver the document that Relator had created and not to use e-mail to send it in case it was subject to discovery.  The document Relator created showed CVS practice of providing free nursing services, why patients do not qualify for reimbursement for nursing services, and the solutions to the problem, which would be changing the practice or continuing the same practice and absorbing the costs.

64.     Approximately two months later, O'Rourke again requested Relator's document be hand delivered to her office, saying she could not find it.  Relator was at home at the time, so O'Rourke agreed Relator could fax her a copy because she needed it immediately for a meeting.

65.     Throughout the process, Relator became increasingly uncomfortable in her responsibility to approve and provide free nursing services, believing it was illegal.  Any time Relator refused to authorize free nursing service for a patient, she was threatened by sales or contracting and directed to continue the same practice because the large profit margins on the drugs allowed CVS to absorb the nursing cost.

66.     Relator called the compliance hot line to discuss the issue but terminated the call because she feared a breach of confidentiality and retaliation.  Ultimately, the Relator did not feel the compliance hotline would be of help because everyone in top management knew about the practice of providing free nursing services, and nothing seemed to change.

67.     Another Director Denise Bagford told Relator to create a work instructions document, which she submitted on February 28, 2013.  In these instructions Relator outlined what CVS's practice will be for different scenarios, with items in red at the end of each section asking for direction as to whether CVS will refuse the patient if they cannot pay for nursing services.  Relator sent these instructions to O'Rourke, compliance staff, billing direct and Bagford.  To date, Relator has received minimal guidance or clarification to her instructions and requests for guidance.  Relator is concerned she will be blamed if sales goals are unmet or clients are lost.

68.     In April 2013, O'Rourke came to Relator's office, where Relator showed O'Rourke non-billed patient volume by payor.  O'Rourke told Relator that "you at least need to bill for the new hemophilia patients."  Relator communicated the instruction by e-mail to her team and copied sales representatives and the program manager.  Relator received multiple complaints from the sales director and program manager about changing the practice of providing free nursing services and commenting on how badly they would look to physicians and patients who expected the free service.  Relator forwarded these concerns to O'Rourke and requested direction on how to proceed, who scheduled a meeting, where she directed that "we" need to put together a process and change the practice immediately, but in the meantime not to bill new hemophilia patients for nursing services.  O'Rourke told her staff to stop putting things in writing.  Thereafter, Relator was excluded from meetings and projects

69.     Relator met with the FEP manager about the $85,000 in nursing services CVS did not bill in 2012 for those patients.  She was aware that CVS had not billed for the nursing services and said CVS needed to change that practice but was going to reschedule a meeting to determine how to proceed.

70.     After working at CVS for two years, Relator has made CVS management aware of the issues of providing free nursing services, highlighted and detailed the expenses, with patient and visit counts per payors on a monthly basis, all toward changing CVS's practice to provide free nursing services.  Relator is now been marginalized, ignored and recently her job was eliminated.

71.     CVS prepared talking points for frequently asked questions from patients CVS would need to begin to bill for nursing services.  Those talking points acknowledge that CVS knew it was wrongful to provide free nursing services.

72.     FEP employees who had been receiving their infusion drugs from Accredo, raised concerns about having to pay for nursing after switching to CVS.

73.     The following is part of an e-mail exchange from Pharmacist Kendra Roundtree expressing concerns about CVS providing free services:

> We recently received a referral from the office of Dr. Raul Cubillas in Dublin, Georgia. The patient is a Georgia Medicaid patient and we were able to dispense and ship Pegasys Proclick, Incivek, and Ribavirin to the patient.  The office requested that we coordinate injection training for this patient (as indicated on our referral form).  I forwarded over the patient's information and the completed referral form to Caremark Nursing on 5/23/2013. When the patient received the medication shipment today, she contacted me wanting to know if I could walk her through how to give the injection via the phone because she had been contacted by nursing and instructed that they would have to complete her injection training via WebEx.  . . . I contacted Cathy Warchal with Caremark Nursing today and she stated that Medicare and Medicaid plans do not pay for in home teachings unless the patient is homebound.  I inquired about several other patients that are covered by Medicaid that we were able to have trained at their residence and was told this was a recent change.  She said Medicaid and Medicare plans have never covered this service and we as a company just absorbed the cost (which is understandable).  Currently the

only teaching services available to Medicaid and Medicare patients are online WebEx (which the manufacturer offers anyway) or free training at a Minute Clinic (which tend to be scarce in rural areas). The last patient out of my office that I know was trained at home was done in early April of this year so any policy changes would have been very recent. It seems as though the $100-200 to send out a nurse for injection training would be easily offset by the revenue brought in from these medications and the increased business we receive from offices when we offer this service.

I spoke with one of the TSEs, Ricky Wilson, today regarding this issue because I know injection training is one of his key selling points to many of our rural offices and he informed me that he wasn't aware of this change either. I just wanted to get some clarification on this issue because if this is true this could really affect our business and physician relationships overall across multiple disease states. We are definitely placing ourselves in a position to not be as competitive in these markets. If possible, could you please find out more about this decision and forward along. I have included Ricky Wilson and Bill Kostecki on this email as I know this issue affects strategy on the sales side as well.

74.     Upon information and belief, the free nursing kickback scheme is a widespread practice throughout the U.S.

75.     Through the free nursing kickback scheme, CVS has become the preferred provider of infusion pharmaceuticals for the physicians who prescribe such drugs.

76.     The free nursing scheme is remuneration that constitutes an unlawful financial relationship under the Stark Laws.

77.     Physicians prescribed Defendant's pharmaceuticals, and Defendant then sought reimbursement from Medicare, Medicaid, and other government programs for such false claims.

78.     The prescriptions made by the physicians did not qualify for any statutory or regulatory exception to the Stark referral prohibition.

79.     Defendant's submission of claims for the designated health services furnished pursuant to the prohibited prescriptions and illegal kickbacks violated the Anti-Kickback Statute, the Stark Laws, and the False Claims Act.

80.     Had the Government known such pharmaceuticals were prescribed as a result of kickbacks, the Government would not otherwise have paid for and/or reimbursed Defendant.

**Defendant's Unlawful Retaliation**

81.     Relator Doe worked for CVS from May 2011 through May 2013.

82.     Relator has over twenty years of experience in nursing and over ten years in the home infusion setting.  Relator has worked as a Nurse and manager for over 35 years.

83.     CVS retaliated against her by removing her from her position as Director of Nursing, marginalizing her, excluding her, using her as a scape goat for the lack of control of high nursing costs lost cost revenue, and finally terminating her.

84.     Relator's duties while working for Defendant included taking referrals and assessing patient candidacy for homecare services.  Relator worked with nurses, clients, client caregivers, and other homecare agencies to formulate the best and safest plan of patient care.

85.     Throughout her tenure working for Defendant, Relator consistently complained to Defendant's management, including her direct supervisor Joan O'Rourke, as well as others. Relator repeatedly warned Defendant's management about the illegality of providing free nursing care.

86.     As a result of the concerns Relator expressed in her capacity, CVS engaged in threats, harassment and discrimination and other negative employment actions with respect to Relator as described more particularly below.

87.     Defendant intentionally retaliated against Relator by discharging her because she raised serious violations of law by Defendant, because she reported some of these violations to the highest levels of management and because the Defendant feared that she would become a Whistleblower in an action against them.

88.     The pattern of Relator bringing concerns to Defendant's attention, and Defendant's response of retaliating started early on.  Relator brought concerns to management's attention immediately after starting her job, including by stating to Defendant's management free nursing services is illegal.

89.     Defendant soon retaliated.

90.     Relator continued to urge Defendant to stop its unlawful activity.  Ultimately, Defendant retaliated against Relator in May 2013 by terminating her because they were worried that she would become a Whistleblower.

91.     As a result of Defendant's acts, Relator has suffered economic damages, including but not limited to the loss of her job, the monies she has expended since her discharge in pursuing new employment, and lost wages, as well as damages resulting from personal hardship, including but not limited to emotional distress.

## FIRST CLAIM

False Claims Act: Presentation of False Claims
(31 U.S.C. § 3729(a)(1)(A)

92.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

93.     The United States seeks relief against Defendant under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

94.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of their requests for reimbursement under the Medicaid and Medicare Programs.

95.     The United States paid Defendant because of Defendant's fraudulent conduct.

96.     By reason of Defendant's false claims, the United States has been damaged in a substantial amount to be determined at trial.

97.     In particular, Defendant have knowingly caused physicians, other healthcare providers and/or beneficiaries to present claims to the United States Government and to Medicaid that were the product of the payment of the above-described kickbacks.  The payment of kickbacks to induce prescriptions constitutes a "thing of value . . . for the purpose of improperly obtaining or rewarding favorable treatment," which were designed to and in fact did increase the level of business in violation of the Anti-Kickback Act of 1986.

98.     As a result of the conduct set forth in this cause of action, the Government suffered harm as a result of paying or reimbursing for pharmaceuticals which, had the Government known such pharmaceuticals were prescribed as a result of kickbacks, the Government would not otherwise have paid for and/or reimbursed them.

99.     By engaging in the conduct described in the foregoing Paragraphs, Defendant has violated the False Claims Act.

## SECOND CLAIM

Using False Records or Statements
(31 U.S.C. § 3729(a)(1)(B)

100.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

101.    The United States seeks relief against Defendant under Section § 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

102.    Defendant knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, in connection with the submission of its requests for reimbursement under the Medicaid and Medicare Programs.

103.     The United States paid such false or fraudulent claims because of Defendant's acts and conduct.

104.     By reason of Defendant's false claims, the United States has been damaged in a substantial amount to be determined at trial.

105.     In particular, Defendant has knowingly caused physicians, other healthcare providers and/or beneficiaries to present claims to the United States Government and to Medicaid that were the product of the payment of the above-described kickbacks.  The payment of kickbacks to induce prescriptions constitutes a "thing of value . . . for the purpose of improperly obtaining or rewarding favorable treatment," which were designed to and in fact did increase the level of business in violation of the Anti-Kickback Act of 1986.

106.     As a result of the conduct set forth in this cause of action, the Government suffered harm as a result of paying or reimbursing for pharmaceuticals which, had the Government known such pharmaceuticals were prescribed as a result of kickbacks, unlawful financial relationship, or violated the Anti-Kickback Statute or the Stark Laws, the Government would not otherwise have paid for and/or reimbursed them.

107.     By engaging in the conduct described in the foregoing Paragraphs, Defendant has violated the False Claims Act.

### THIRD CLAIM

False Claims Act: Making or Using False Record
or Statement to Avoid an Obligation to Refund
(31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(1)(G) as amended in 2009)

108.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

109.     The United States seeks relief against Defendant under Section § 3729(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

110.    Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with the submission of their requests for reimbursement under the Medicaid and Medicare Programs.

111.    Defendant failed to pay or transmit money due to the United States because of Defendant's acts and conduct.

112.    By reason of the Defendant's use of false statements, the United States has been damaged in a substantial amount to be determined at trial.

## FOURTH CLAIM

California False Claims Act
(Cal. Govt. Code §§ 12650 *et seq*.)

113.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

114.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Govt. Code §§ 12650 *et seq*.

115.    By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of the State or of any political subdivision thereof false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

116.    The State of California, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

117.     By reason of these payments, the State of California has been damaged, and continues to be damaged in a substantial amount.

## FIFTH CLAIM

Colorado Medicaid False Claims Act
C.R.S. §§ 25.5-4-304, et seq.

118.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

119.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S. §§ 25.5-4-304, et seq.

120.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented a false or fraudulent claim to an officer or employee of the State of Colorado for payment or approval under the medical assistance programs.

121.     By reason of these payments, the State of Colorado has been damaged, and continues to be damaged in a substantial amount.

## SIXTH CLAIM

Connecticut False Claims Act
(Gen. Stat. of Ct., Chap. 319v, §§17b-301a, *et seq.*)

122.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

123.     This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Gen. Stat. of Ct., Chap. 319v, §§17b-301a *et seq*.

124.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented a false or fraudulent claim to an officer or employee of the State of Connecticut for payment or approval under the medical assistance programs.

125.     By reason of these payments, the State of Connecticut has been damaged, and continues to be damaged in a substantial amount.

## SEVENTH CLAIM

### Delaware False Claims and Reporting Act
### (6 Del. Code §§ 1201 *et seq.*)

126.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

127.     This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del C. §§ 1201 *et seq.*

128.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the Government false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals, and used false or fraudulent records to accomplish this purpose.

129.     The State of Delaware, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

130.     By reason of these payments, the State of Delaware has been damaged, and continues to be damaged in a substantial amount.

## EIGHTH CLAIM

### Florida False Claims Act
### (Fla. Stat. §§ 68.081 *et seq.*)

131.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

132.     This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*

133.    By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of an agency false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

134.    The State of Florida, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

135.    By reason of these payments, the State of Florida has been damaged, and continues to be damaged in a substantial amount.

## NINTH CLAIM

Georgia False Medicaid Claims Act
(O.C.G.A. §§ 49-4-168 *et seq.*)

136.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

137.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.*

138.    By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the Georgia Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

139.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

140.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## TENTH CLAIM

### Illinois Whistleblower Reward and Protection Act
### (740 Ill. Comp. Stat. §§ 175/1 *et seq.*)

141.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

142.     This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*

143.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of the State or a member of the Guard false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

144.     The State of Illinois, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

145.     By reason of these payments, the State of Illinois has been damaged, and continues to be damaged in a substantial amount.

## ELEVENTH CLAIM

### Indiana False Claims and Whistleblower Protection Act
### (In. Code §§ 5-11-5.5 *et seq.*)

146.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

147.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, In. Code §§ 5-11-5.5 *et seq.*

148.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the Indiana Medicaid Program false or

fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

149.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

150.    By reason of these payments, the Indiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## TWELFTH CLAIM

Louisiana False Claims Act
(46 La. Rev. Stat. Ch. 3 §§ 437.1 *et seq.*)

151.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

152.    This is a claim for treble damages and civil penalties under the Louisiana False Claims Act, 46 La. Rev. Stat. Ch. 3 §§ 437.1 *et seq.*

153.    By virtue of the acts described above, Defendant offered or paid remuneration, including but not limited to kickbacks, directly or indirectly, overtly or covertly, in cash or in kind, for a good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

154.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented a false or fraudulent claim to the State of Louisiana.

155.    By virtue of the acts described above, Defendant knowingly engaged in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds.

156.    By reason of these payments, the State of Louisiana has been damaged, and continues to be damaged in a substantial amount.

## THIRTEENTH CLAIM

Maryland False Claims Act
(Md. Ann. Code, Health Gen., Subtitle 6, §§ 2-601 *et seq.*)

157.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

158.     This is a claim for treble damages and civil penalties under the Maryland False Claims Act, Md. Ann. Code, Health Gen., Subtitle 6, §§ 2-601 *et seq.*

159.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented a false or fraudulent claim to the State of Maryland.

160.     By virtue of the acts described above, Defendant knowingly a false and fraudulent claim to obtain, or attempt to obtain, payment from medical assistance programs funds.

161.     By reason of these payments, the State of Maryland has been damaged, and continues to be damaged in a substantial amount.

## FOURTEENTH CLAIM

Massachusetts False Claims Act
(Mass. Gen. Laws ch. 12 §§ 5A *et seq.*)

162.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

163.     This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 §§ 5A *et seq.*

164.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

31

165.     The State of Massachusetts, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

166.     By reason of these payments, the State of Massachusetts has been damaged, and continues to be damaged in a substantial amount.

## FIFTEENTH CLAIM

Michigan Medicaid False Claim Act
(M.C.L.S. §§ 400.601 *et seq.*)

167.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

168.     This is a claim for civil penalties under the Michigan Medicaid False Claims Act, MCLS §§ 400.601 *et seq.*

169.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be made to the Michigan Medicaid Program false statements or false representations of material fact in the application for Medicaid benefits and for use in determining rights to Medicaid benefits.

170.     The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

171.     By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## SIXTEENTH CLAIM

Montana False Claims Act
(Mont. Code. §§ 17-8-401 *et seq.*)

172.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

173.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code §§ 17-8-401 *et seq.*

174.    By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the Montana Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

175.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

176.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## SEVENTEENTH CLAIM

Nevada False Claims Act
(Nev. Rev. Stat. §§ 357.010 *et seq.*)

177.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

178.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*

179.    By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

180.    The State of Nevada, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

181.     By reason of these payments, the State of Nevada has been damaged, and continues to be damaged in a substantial amount.

## EIGHTEENTH CLAIM

New Jersey False Claims Act
(N. J. Stat. Ann. §§ 2A:32C-1 *et seq.*)

182.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

183.     This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N. J. Stat. Ann. §§ 2A:32C-1 *et seq.*

184.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an employee, officer or agent of New Jersey, or to any other contractor, grantee or other recipient of New Jersey funds, false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals, and used false or fraudulent records to accomplish this purpose.

185.     The State of New Jersey, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

186.     By reason of these payments, the State of New Jersey has been damaged, and continues to be damaged in a substantial amount.

## NINETEENTH CLAIM

New York False Claims Act
(N.Y. Fin. Law §§ 187 *et seq.*)

187.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

188.     This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. Fin. Law §§ 187 *et seq.*

189.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an employee, officer or agent of the state or a local government false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

190.     The State of New York, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

191.     By reason of these payments, the State of New York has been damaged, and continues to be damaged in a substantial amount.

## TWENTIETH CLAIM

North Carolina False Claims Act
(N. C. Gen. Stat. Ann. §§ 1-605 *et seq.*)

192.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

193.     This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N. C. Gen. Stat. Ann. §§ 1-605 *et seq.*

194.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the State of North Carolina false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

195.     The State of North Carolina, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

196.     By reason of these payments, the State of North Carolina has been damaged, and continues to be damaged in a substantial amount.

**TWENTY-FIRST CLAIM**

Oklahoma Medicaid False Claims Act
(Okla. Stat. Ann. §§ 5053 *et seq.*)

197.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

198.     This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. §§ 5053 *et seq.*

199.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of the State of Oklahoma false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

200.     The State of Oklahoma, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

201.     By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**TWENTY-SECOND CLAIM**

Rhode Island False Claims Act
(R. I. St. §§ 9-1.1-1 *et seq.*)

202.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

203.     This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R. I. St. §§ 9-1.1-1 *et seq.*

204.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of the state or a member

of the guard false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

205.    The State of Rhode Island, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

206.    By reason of these payments, the State of Rhode Island has been damaged, and continues to be damaged in a substantial amount.

## TWENTY-THIRD CLAIM

Tennessee Medicaid False Claims Act
(Tenn. Code §§ 71-5-181 *et seq.*)

207.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

208.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*

209.    By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to the state false or fraudulent claims for the improper payments or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

210.    The State of Tennessee, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

211.    By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged in a substantial amount.

## TWENTY-FOURTH CLAIM

Texas Medicaid Fraud Prevention Law
(Tex. Hum. Res. Code §§ 36.001 *et seq.*)

212.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

213.     This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§ 36.001 *et seq.*

214.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly made or caused to be made false statements or misrepresentations of material fact, and knowingly concealed or failed to disclose information to permit persons to receive benefits or payments under the Medicaid program for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

215.     Defendant knowingly paid, charged, solicited accepted or received, in addition to an amount paid under the Medicaid program, a gift, money, a donation or other consideration as a condition to the provision of a service or product or the continued provision of a service or product where cost of the service or product was paid for, in whole or in part, under the Medicaid program.

216.     The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

217.     By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## TWENTY-FIFTH CLAIM

Virginia Fraud against Taxpayers Act
(Va. Code §§ 8.01-216.1 *et seq.*)

218.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

219.     This is a claim for treble damages and civil penalties under the Virginia Fraud against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*

220.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of the Commonwealth false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

221.     The Virginia Commonwealth Government, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

222.     By reason of these payments, the Virginia Commonwealth Government has been damaged, and continues to be damaged in a substantial amount.

## TWENTY-SIXTH CLAIM

Wisconsin False Claims Act
(Wis. Stat. Ann. §§ 20.931 (1) *et seq.*)

223.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

224.     This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act, Wis. Stat. Ann. §§ 20.931 (1) *et seq.*

225.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer, employee or agent of Wisconsin false

or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

226.     The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

227.     By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

### TWENTY-SEVENTH CLAIM

District of Columbia False Claims Act
(D.C. Code §§ 2-308.13 *et seq.*)

228.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

229.     This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq*.

230.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer or employee of the District false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

231.     The District of Columbia, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

232.     By reason of these payments, the District of Columbia has been damaged, and continues to be damaged in a substantial amount.

## TWENTY-EIGHTH CLAIM

Chicago False Claims Act
(Mun. Code Ch. 1 §§ 22-010 *et seq.*)

233.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

234.     This is a claim for treble damages and civil penalties under the Chicago False Claims Act, Mun. Code Ch. 1 §§ 22-010 *et seq.*

235.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer, employee or agent of Chicago false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

236.     The City of Chicago, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

237.     By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

## TWENTY-NINTH CLAIM

New York City False Claims Act
(N.Y.C. Admin. Code §§ 7-801 *et seq.*)

238.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

239.     This is a claim for treble damages and civil penalties under the New York City False Claims Act, N.Y.C. Admin. Code §§ 7-801 *et seq.*

240.     By virtue of the submissions of non-reimbursable claims described above, Defendant knowingly caused to be presented to an officer, employee or agent of New York City

false or fraudulent claims for the improper payment or approval of prescriptions for infusion pharmaceuticals and used false or fraudulent records to accomplish this purpose.

241.     The City of New York, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

242.     By reason of these payments, the City of New York has been damaged, and continues to be damaged in a substantial amount.

**THIRTIETH CLAIM**

False Claims Act: Retaliation
(31 U.S.C. § 3730(h))

243.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

244.     As more particularly set forth in the foregoing Paragraphs by virtue of the acts alleged herein, and in particular paragraphs, the Defendant discharged, demoted, threatened, harassed and/or discriminated against the Relator in the terms and conditions of her employment after Relator lawfully reported and investigated what he believed to be fraudulent conduct or wrongdoing to her superiors in violation of 31 U.S.C. 3730(h) in furtherance of an investigation under the False Claims Act.  Relator seeks compensatory damages and damages for emotional distress and other appropriate statutory relief pursuant to this section.

**THIRTY-FIRST CLAIM**

Retaliation
(N.Y. Fin. Law § 191))

245.     Relator re-alleges and incorporates by reference herein the allegations previously alleged.

246.     As more particularly set forth in the foregoing Paragraphs by virtue of the acts alleged herein, and in particular paragraphs, the Defendant discharged, demoted, suspended,

42

threatened, harassed and discriminated against the Relator in the terms and conditions of her employment after Relator lawfully reported and investigated what he believed to be fraudulent conduct or wrongdoing to her superiors in violation of N.Y. Fin. Law § 191 in furtherance of an investigation or other efforts to stop one or more violations of this article.  Relator seeks compensatory damages and damages for emotional distress and other appropriate statutory relief pursuant to this section.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government, the States and Cities, demands judgment against the above-named Defendant, ordering that:

a.        Pursuant to 31 U.S.C. § 3729(a), Defendant pay: an amount equal to three times the amount of damages the United States Government has sustained as a result of Defendant's actions, which Relator currently estimate to be in the hundreds of millions of dollars; plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729 *et seq.*, or such other penalty as the law may permit and/or require for each violation of other laws which governed Defendant's conduct.

b.        Relator be awarded a realtor's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c.        Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

     d.           Relator be awarded such relief as is appropriate under the provisions of

31 U.S.C. § 3730(h) of the False Claims Act and NY State Finance Law § 191 of the New York

False Claims Act for retaliatory discharge, including:

          (1)     two times the amount of back pay with

                     appropriate interest including pre-and post-

                     judgment interest;

          (2)     compensation for special damages, including damages for emotional

                     distress, sustained by Relator in an amount to be determined at trial;

          (3)     litigation costs and reasonable attorney's fees; and

          (4)     such punitive damages as may be awarded under applicable law; and

     e.          As provided by the following State laws, Relator and each named State

Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual

damages sustained by each State as a result of Defendant's actions, as well as the maximum

statutory civil penalty for each violation by Defendant within each State; Relator be awarded

relator's share of any judgment; Relator be awarded all costs and expenses associated with each

of the pendent State claims, plus attorney's fees.:

      Cal. Govt. Code §§12650 *et seq.*;
      C.R.S. §§ 25.5-4-304, et seq.
      Gen. Stat. of Ct., Chap. 319v, §§17b-301a, *et seq.*
      6 Del. C. §§ 1201 *et seq.*;
      Fla. Stat. Ann. §§ 68.081 *et seq.*;
      O.C.G.A. §§ 49-4-168 *et seq.*;
      740 Ill. Comp. Stat. §§ 175/1 *et seq.*;
      In. Code §§ 5-11-5.5 *et seq.*;
      46 La. Rev. Stat. Ch. 3, §§ 437.1 *et seq.*;
      Maryland Ann. Code, Health General, Subtitle 6, §§ 2-601 *et seq.*;,
      Mass. Gen. Laws Ch. 12 §§ 5A *et seq.*;
      MCLS §§ 400.601 *et seq.*
      Mont. Code §§ 17-8-401 *et seq.*;
      Nev. Rev. Stat. Ann. §§ 357.010 *et seq.*;
      N. J. Stat. Ann. §§ 2A:32C-1 *et seq.*;

N.Y. Fin. Law §§ 187 *et seq.*;
N. C. Gen. Stat. Ann. §§1-605 *et seq.*;
Okla. Stat. Ann. §§ 5053 *et seq.*;
R. I. St. §§ 9-1.1-1 *et seq.*;
Tenn. Code Ann. §§ 71-5-181 *et seq.*;
Tex. Hum. Res. Code §§ 36.001 *et seq.*;
Va. Code. Ann. § 8.01-216.1 *et seq.*;
Wis. Stat. Ann. §§20.931 (1) *et seq.*;
D.C. Code Ann. §§ 2-308.13 *et seq.*;
Chicago False Claims Act, Mun. Code ch.1, §§ 22-010 *et seq.;*
New York City False Claims Act, N.Y.C. Admin. Code  §§ 7-801 *et seq.*; and

    f.        Relator, the United States and the State and City Plaintiffs be awarded

such other and further relief as the Court may deem to be just and proper.

## JURY TRIAL IS DEMANDED

Dated: New York, New York
      July 2, 2013

                          SADOWSKI FISCHER PLLC

                 By:

                 Robert W. Sadowski
                 39 Broadway, Suite 1540
                 New York, New York  10006
                 Telephone: (212) 913-9678
                 Facsimile: (212) 502-5762
                 rsadowski@diamondmccarthy.com
                 Attorneys for Relator John Doe

TO:
United States Attorney
for the Southern District of New York
86 Chambers Street
New York, New York

Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001